Appeal Nos. 24-3748, 24-6757

———————————————————————————————

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————————————————————

MOONBUG ENTERTAINMENT LIMITED AND TREASURE STUDIO, INC.,

*Plaintiffs-Appellees*,

v.

BABYBUS CO., LTD. AND BABYBUS (FUJIAN) NETWORK TECHNOLOGY CO., LTD.,

*Defendants-Appellants*.

———————————————————————————————

On Appeal from the United States District Court
for the Northern District of California, San Francisco Division
No. 3:21-cv-06536-EMC, Honorable Edward Chen

———————————————————————————————

## APPELLEES' ANSWERING BRIEF

———————————————————————————————

**TYZ LAW GROUP PC**
Jennifer L. Kelly (CSB No. 193416)
Ryan Tyz (CSB No. 234895)
Erin Jones (CSB No. 252947)
Deborah Hedley (CSB No. 276826)
Ciara N. McHale (CSB No. 293308)
Sean Apple (CSB No. 305692)
Chieh Tung (CSB No. 318963)
4 Embarcadero Center, Suite 1400
San Francisco, California 94111
(415) 868-6900

**HORVITZ & LEVY LLP**
Eric S. Boorstin (CSB No. 253724)
John B. Sprangers (CSB No. 302891)
3601 West Olive Avenue, 8th Floor
Burbank, California 91505-4681
(818) 995-0800

*Attorneys for Plaintiffs-Appellees*
*Moonbug Entertainment Limited and Treasure Studio, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellees state that:

- Moonbug Entertainment Limited is a wholly owned subsidiary of Project ABC Holdco (Jersey) Limited; Project ABC Holdco (Jersey) Limited is a wholly owned subsidiary of Lunar Bidco Limited; Lunar Bidco Limited is a wholly owned subsidiary of Aventine Intermediate LLC.

- Treasure Studio, Inc., is a wholly owned subsidiary of Lunar US Holdings, Inc.; Lunar US Holdings, Inc. is a wholly owned subsidiary of Aventine Intermediate LLC.

- Aventine Intermediate LLC is a wholly owned subsidiary of Aventine Holdings LLC; Aventine Holdings LLC is a wholly owned subsidiary of Aventine Holdings II LLC; Aventine Holdings II is a wholly owned subsidiary of Aventine Holdings III LLC; and Aventine Holdings III LLC is a wholly owned subsidiary of Candle Media, LLC; Candle Media LLC is a majority owned subsidiary of BCP Aventine Aggregator LP.

- BCP Aventine Aggregator LP has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

i

TABLE OF CONTENTS

**Page**

Table of Authorities ...................................................................vi

Introduction .............................................................................1

Issues Presented ........................................................................2

Statement of the Case.................................................................3

I.     Moonbug Creates the Hit Video Series CoComelon, Starring JJ .........3

II.    BabyBus Rips Off CoComelon and Covers It Up .............................6

III.   The District Court Concludes JJ is Protectable on Summary Judgment ...........................................................................9

IV.    The Evidence at Trial Overwhelmingly Favors Moonbug .................12

       A.   The Jury Hears Extensive Evidence that the CoComelon Works Are Copyright-Protectable .............................................12

       B.   The Jury Hears Extensive Evidence that BabyBus Willfully Infringed the CoComelon Works....................................14

       C.   The Jury Hears No Defense Expert Testimony on Protectability and Infringement .................................16

       D.   The Jury Hears BabyBus' Independent Development Defense Fall Apart ...................................................................17

V.     The District Court Carefully Prepares the Jury Instructions and Verdict Form ......................................................................17

       A.   Selection and Arrangement Instructions...................................17

       B.   Extrinsic Test Filtering Instructions .........................................18

       C.   Scènes à Faire Instructions.......................................................19

ii

D.     Verdict Form and Virtual Identity Jury Question ....................19

VI.    The Jury Renders a Verdict for Moonbug..........................................20

VII.   The District Court Denies BabyBus' Posttrial Motions and Sanctions BabyBus................................................................................20

VIII.  BabyBus Appeals ........................................................................21

Summary of the Argument..........................................................................21

Argument......................................................................................................23

I.     The District Court Correctly Granted Partial Summary Judgment That CoComelon's JJ Was a Protectable Character............................23

A.     The District Court Applied the Correct Character Delineation Test ..........................................................................23

B.     BabyBus Does Not Dispute That JJ Meets the First Two Elements ..................................................................................23

C.     JJ Meets the Third Element Because He Is Especially Distinctive .................................................................................24

D.     BabyBus' Arguments that JJ Is Not Especially Distinctive Fail.....................................................................................28

1.     BabyBus Focuses on JJ's Characteristics Too Generally and Overlooks Specific Expression ..............28

2.     Other Cartoon Baby Characters Do Not Make JJ Unprotectable....................................................................32

3.     A Planning Document Describing JJ as a "Quintessential Every Kid" Does Not Make JJ Unprotectable....................................................................34

4.     The Court Should Reject BabyBus' Invented Standard .........................................................................35

iii

E.    Any Error in Finding JJ a Protectable Character is Harmless Because the Jury Found the Visual Rendering Alone Infringed ........................................................................... 37

II.    The District Court Did Not Err in Instructing the Jury ...................... 38

A.    The Court Reviews the Jury Instructions for an Abuse of Discretion ............................................................................... 38

B.    The District Court Did Not Err in Its Instruction on Selection and Arrangement ........................................................ 39

1.    The District Court Did Not Abuse Its Discretion by Giving a Selection and Arrangement Instruction .......... 39

2.    The District Court Did Not Abuse Its Discretion in Formulating Its Selection and Arrangement Instruction ................................................................. 42

C.    The District Court Did Not Abuse Its Discretion or Misstate the Law in Formulating Its Filtering Jury Instruction .............. 44

1.    The Instructions as a Whole Told the Jury Which Unprotectable Elements to Filter .................................... 44

2.    The District Court Correctly Left the Fact-Intensive Issues of Protectability to the Jury ................................. 46

3.    The District Court Properly Rejected BabyBus' Proposed Filtering Instruction ........................................ 52

4.    Any Error in the Filtering Instruction Was Harmless Because Moonbug Relied on a Selection and Arrangement ................................................................. 54

D.    The District Court Did Not Abuse Its Discretion or Misstate the Law in Formulating Its Scènes à Faire Instruction ............. 55

E.    The District Court Did Not Abuse Its Discretion by Not Separately Instructing on Merger .............................................. 59

iv

F.  The District Court Did Not Err by Instructing the Jury to Apply a Substantial Similarity Standard....................................60

G.  Any Error in the Instructions Was Harmless Because the Jury Found Virtual Identity........................................................62

III.  The District Court Did Not Abuse Its Discretion in Its Verdict Form ............................................................................................64

Conclusion ........................................................................................66

Statement of Related Cases............................................................67

Certification of Compliance with Type-Volume Limitation, Typeface Requirements, and Type-Style Requirements ........................................68

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Acad. Games League of Am., Inc.,*
    89 F.3d 614 (9th Cir. 1996) ...................................................................59

*Apple Comput., Inc. v. Microsoft Corp.,*
    35 F.3d 1435 (9th Cir. 1994) ................................................................63

*Bach v. Forever Living Prods. U.S., Inc.,*
    473 F.Supp.2d 1127 (W.D. Wash. 2007) ..............................................32

*Bigelow v. RKO Radio Pictures,*
    327 U.S. 251 (1946).............................................................................65

*Brewer v. City of Napa,*
    210 F.3d 1093 (9th Cir. 2000) ..............................................................53

*Chinaryan v. City of Los Angeles,*
    113 F.4th 888 (9th Cir. 2024) ...............................................................49

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.,*
    97 F.3d 1504 (1st Cir. 1996)................................................................47

*Daniels v. Walt Disney Co.,*
    958 F.3d 767 (9th Cir. 2020) ...............................................................31

*DC Comics v. Towle,*
    802 F.3d 1012 (9th Cir. 2015) ..................................................23, 35, 36

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey,*
    95 F.3d 1422 (9th Cir. 1996) ...............................................................65

*Desire, LLC v. Manna Textiles, Inc.,*
    986 F.3d 1253 (9th Cir. 2021).............................................................52

*Dream Games of Ariz., Inc. v. PC Onsite,*
    561 F.3d 983 (9th Cir. 2009) ...........................................................43, 50

*Ets-Hokin v. Skyy Spirits, Inc.,*
    225 F.3d 1068 (9th Cir. 2000) .........................................................46, 63

*Gaiman v. McFarlane,*
    360 F.3d 644 (7th Cir. 2004) ...........................................................32, 35

vi

*Halicki Films, LLC v. Sanderson Sales & Mktg.*,
    547 F.3d 1213 (9th Cir. 2008) ...................................................46

*Hana Fin., Inc. v. Hana Bank*,
    574 U.S. 418 (2015)....................................................... 46, 47, 51

*Hana Fin., Inc. v. Hana Bank*,
    735 F.3d 1158 (9th Cir. 2013) .................................................47

*Hanagami v. Epic Games, Inc.*,
    85 F.4th 931 (9th Cir. 2023) ............................................. 30, 54

*Harper House, Inc. v. Thomas Nelson, Inc.*,
    889 F.2d 197 (9th Cir. 1989) .......................................... *passim*

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,
    922 F.3d 946 (9th Cir. 2019) ............................................ 60, 62

*Mattel, Inc. v. MGA Ent., Inc.*,
    616 F.3d 904 (9th Cir. 2010) .......................................... *passim*

*Matthew Bender & Co. v. W. Publ'g Corp.*,
    158 F.3d 674 (2d Cir. 1998) ....................................................47

*Olson v. Nat'l Broad. Co.*,
    855 F.2d 1446 (9th Cir. 1988)..................................................32

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) .................................................51

*Satava v. Lowry*,
    323 F.3d 805 (9th Cir. 2003) ............................................ 55, 56

*Shad v. Dean Witter Reynolds, Inc.*,
    799 F.2d 525 (9th Cir. 1986) ..................................................53

*Skidmore v. Led Zeppelin*,
    952 F.3d 1051 (9th Cir. 2020)................................ 39, 41, 43, 51

*Swirsky v. Carey*,
    376 F.3d 841 (9th Cir. 2004) ...................................... 44, 54, 56

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) ..................................................43

*U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*,
    89 F.4th 1126 (9th Cir. 2023) .................................................39

*United States v. Hui Hsiung,*
　778 F.3d 738 (9th Cir. 2015) ...........................................................48

*Van Cleef v. Aeroflex Corp.,*
　657 F.2d 1094 (9th Cir. 1981) ................................................. 42, 55

*Wall Data Inc. v. L.A. County Sheriff's Dep't,*
　447 F.3d 769 (9th Cir. 2006). ..........................................................38

*Walt Disney Prods. v. Air Pirates,*
　581 F.2d 751 (9th Cir. 1978) ...........................................................36

*Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply Inc.,*
　106 F.3d 894 (9th Cir. 1997) ................................................... 38, 65

*Williams v. Gaye,*
　895 F.3d 1106 (9th Cir. 2018) ..................................................*passim*

*Zhang v. Am. Gem Seafoods, Inc.,*
　339 F.3d 1020 (9th Cir. 2003) ........................................................64

**Statutes**

17 U.S.C. § 302 ................................................................................40

**Rules**

Fed. R. Civ. P. 49 .............................................................................64

## INTRODUCTION

CoComelon is an animated show made for a preschool audience. Moonbug has copyrights in CoComelon that cover dozens of episodes alongside artwork for CoComelon's beloved and recognizable star JJ and his supporting cast of family characters. CoComelon is the most watched YouTube channel in the United States and one of the top ten shows on Netflix. Recognizing CoComelon's runaway success, BabyBus set out to create a knock-off show, Super JoJo.

After three weeks of trial and three days of deliberations, the jury found that BabyBus willfully infringed Moonbug's copyrights in CoComelon. In the face of overwhelming evidence of willful infringement, BabyBus argues that the district court erred in finding that CoComelon's world-famous JJ character was copyright protected and quibbles with various jury instructions. This Court should reject those arguments and affirm.

It is no surprise that the jury found BabyBus willfully infringed CoComelon's copyrights. BabyBus admitted to willfully infringing six of the earliest CoComelon episodes by copying them frame-by-frame and conceded that all the CoComelon copyright registrations were valid and enforceable. BabyBus' development documents were filled with smoking guns, such as directives to make Super JoJo videos "as identical as possible" to CoComelon and documents showing that BabyBus' developers *traced* over CoComelon characters and used

1

CoComelon Works as their "draft" to make Super JoJo videos. BabyBus'
witnesses did no favors to its defense. BabyBus' co-founder admitted repeatedly
to plagiarizing CoComelon's protectable expression. And BabyBus' star witness,
who was supposed to present an independent development defense, admitted that
his supposedly "original" design was not used to develop Super JoJo and that
BabyBus instead referenced CoComelon's copyrighted works.

The district court correctly concluded on summary judgment that JJ is
protectable as a distinct and recognizable animated character that is the
culmination of a mountain of creative decisions. And the district court fully and
fairly instructed the jury on BabyBus' various theories that the CoComelon works
were supposedly so constrained by the underlying subject matter that there was
nothing wrong with BabyBus' extensive and intentional copying. A jury would
have rejected BabyBus' theories however they could have been phrased. For these
reasons and others discussed below, this Court should affirm.

## ISSUES PRESENTED

1.     Whether the district court correctly granted summary judgment that
the central animated character in one of the world's most successful shows was
protected by copyright.

2

2.     Whether the district court abused its discretion in formulating jury instructions about the legal principles governing protectable expression and how to compare the parties' works.

3.     Whether the district court abused its discretion in adopting a general verdict form.

STATEMENT OF THE CASE

## I.     Moonbug Creates the Hit Video Series CoComelon, Starring JJ

Treasure Studio is the author and Moonbug is the exclusive licensee of the asserted copyrights in the CoComelon video series.  (7-SER-1414.)  CoComelon was first made in 2017 in a small office with four employees but grew into one of the most popular preschool video series in the world.  (*See* 6-ER-1308; 8-SER-1586.)

As of 2023, CoComelon's YouTube channel had 158 million subscribers, the most of any YouTube children's channel, with over 300 episodes translated into 27 languages and viewed over 158 billion times.  (3-SER-713; 8-SER-1530–32; 16-SER-3578.)  CoComelon is on other large platforms, too, spending months among the Top 10 shows on Netflix, where it was watched for 33 billion minutes in 2021—more than *Squid Game* and *Bridgerton* combined.  (11-SER-2184; 16-SER-3570.)  CoComelon toys and other merchandise are ubiquitous, and

3

CoComelon live shows sell out auditoriums in tours across the United States. (11-SER-2184–85.)

CoComelon's star is its main character, JJ (shown at right). (*See* 5-SER-879; 8-SER-1518; 10-SER-1984; 16-SER-3434; 16-SER-3623.) As an animated character, JJ has a particular combination of physical features, including his wide round head with flattening above the ears, his large eyes with flattening on the bottom, his wide expressive mouth with two top teeth, his half-moon shaped smile, his mid-forehead tuft of sculpted clay-like hair, and his cartoony ears and hands. (5-SER-878–80; 10-SER-1985–87; 16-SER-3434.) JJ also has a unique personality. (5-SER-879–81.)



Although JJ is drawn as a young toddler, he acts like a much older child—he attends school, behaves with physical and emotional maturity well beyond his apparent age, never throws tantrums or remains sad for longer than a few moments, never fights with his siblings, and has unrealistically advanced proficiency in speech and physical coordination. (5-SER-879–84; 8-SER-1518–19; 10-SER-1981–82; 10-SER-1989–91; 10-SER-2013.) JJ uses a signature "Wow!" gesture to express anticipation and celebration. (3-SER-659, 682, 693; 5-SER-883–84; 9-SER-1629; 10-SER-1990–91.) CoComelon videos focus on JJ's activities and his

interactions with his endlessly supportive family: his creative mom, goofy dad, older brother and older sister, whose relationships to JJ and each other are developed through the videos.  (*See* 5-SER-882; 8-SER-1520–21; 10-SER-1989, 2004–05; 17-SER-3750–64.)

Moonbug owns forty-two copyright registrations in CoComelon (the "CoComelon Works"): thirty-seven registrations on specific CoComelon animated videos (6-ER-1272–1303; 16-SER-3600–33; 17-SER-3635–3737), sound recording registrations of CoComelon songs (Trial Exs. 1083–1113), and registrations of the static visual representations of JJ (6-ER-1308–11), his family members (6-ER-1304–07; 17-SER-3738–43), and various animal characters (6-ER-1312–14).  The registered CoComelon videos include some of its most popular videos, including *Bath Song*, *Boo Boo Song*, *Car Wash Song*, *Sick Song*, *Swimming Song*, *Yes Yes Vegetables Song*, and *Yes Yes Playground Song*.  (6-SER-1272, 1295, 1297; 16-SER-3580; 16-SER-3600–23; 17-SER-3701, 3707.)  *Bath Song* was viewed over six billion times as of 2023.  (8-SER-1534; 16-SER-3580.)  These videos highlight the physical and conceptual elements that make JJ a unique, distinctive character, and the combination of expressive elements that make the CoComelon Works recognizable and distinctive.

## II.    BabyBus Rips Off CoComelon and Covers It Up

In 2018, BabyBus planned to launch a young children's channel for toddlers on YouTube and identified CoComelon as the top channel in this market.  (6-ER-1214; 4-SER-782–804; 9-SER-1774; 18-SER-3923–28.)  BabyBus studied CoComelon and instructed its employees to "Use the kids' channel Cocomelon as the target setting" for the new show.  (9-SER-1778, 1819–21; 15-SER-3331.)  BabyBus' "master plan" for the new show, which "served as the blueprint for the production team," proposed CoComelon and its star JJ as the "focus of the visuals for the Super JoJo show."  (9-SER-1821–22; 16-SER-3353–54.)  The only images in the "Focus of the Visuals" section of Super JoJo's "production specifications" were of JJ.  (9-SER-1842.)  BabyBus knew that these images contained CoComelon's intellectual property yet provided them to their team "to create a look and feel similar to CoComelon's."  (1-SER-122; 9-SER-1842.)

All of BabyBus' Super JoJo videos center on a baby boy character called "JoJo." (9-SER-1824, 1888.) In the "master plan," JoJo has a full head of hair, defined lips, and no teeth. (16-SER-3345 (top right image).) But BabyBus rejected this design, choosing instead to create a model more similar to JJ. (16-SER-3434 (JJ, bottom right image), 3503 (JoJo, middle right image); *see also* 5-SER-907–09, 1124–30; 16-SER-3523; 17-SER-3864.) Planning documents for Super JoJo videos instructed BabyBus designers that "[t]he scenes should be as identical as possible to CoComelon," providing links to CoComelon videos along with screenshots identifying the scenes and shots to copy. (15-SER-3271–76, 3285–90, 3301–10.) Indeed, many of the first Super JoJo videos were frame-by-frame copies of some of CoComelon's most popular copyrighted videos. (3-SER-689, 691; 5-SER-887–906, 929–1122; 16-SER-3433; 18-SER-3937.) BabyBus even made rough drafts of their videos by excerpting CoComelon videos and images and sketching their own characters on top of CoComelon's:



7



| Image from BabyBus' Planning File | Image from CoComelon Work |
|---|---|
| (16-SER-3407.) | (16-SER-3608.) |
| (15-SER-3275.) | (16-SER-3600.) |

(*See* 3-SER-751; 3-SER-760; 5-SER-888.)

Around 2020, BabyBus brought in a new employee to redesign the JoJo character but rejected the new designs because they were too different from the design the jury found virtually identical to CoComelon's JJ, and BabyBus was afraid the audience would not accept him. (13-SER-2691; *see* 5-SER-871–72; 10-SER-2017; 16-SER-3425–32, 3494–99; 17-SER-3863.)

By August 2021, when Moonbug sued, BabyBus' YouTube channels had hundreds of Super JoJo videos. (16-SER-3433.)

From the outset of this litigation, BabyBus relied on a fraudulent independent development theory for their defense. (*See* 1-SER-2; 9-SER-1734;

18-SER-3866.) The crux of this alleged defense was that JoJo was not copied from JJ but was supposedly independently created based on a character from a 2016 BabyBus video named DouDou. (1-SER-2; 17-SER-3858–60.) BabyBus repeatedly submitted an image of DouDou to the district court in pleadings and declarations. (1-SER-2.) But the image BabyBus asked the court to rely on was not DouDou from 2016, but an altered version of DouDou that BabyBus created years later during the litigation. (1-SER-2; 9-SER-1903, 1905–07, 1910; 12-SER-2586; 16-SER-3532–33; 18-SER-3866.) BabyBus made this image by altering the original DouDou to look more like JJ—adding a new mouth shape, redrawing the front teeth, reshaping the facial features, and adding a JJ-like tuft of hair. (1-SER-2; 10-SER-2062–67; 18-SER-3866–77.)

## III. The District Court Concludes JJ is Protectable on Summary Judgment

Moonbug sought summary judgment that (1) the CoComelon copyrights are valid and enforceable; (2) the CoComelon characters, including JJ, are protected by copyright; and (3) the Super JoJo series infringed CoComelon copyrights based on its pervasive copying of CoComelon expression, especially the JJ character. (6-SER-1163, 1168.) Moonbug submitted a declaration and report from Fran Krause, an award-winning



(5-SER-908.)

9

animator and professor of character animation.  (5-SER-840; 18-SER-3933.)  His report detailed the distinct and unique combination of elements of JJ, (5-SER-878–82), how BabyBus created its JoJo model by carefully modifying a generic model to closely resemble JJ, (5-SER-865, 907–09, 1124–30), and the elements of CoComelon expression (including CoComelon characters) misappropriated by BabyBus in its Super JoJo videos (5-SER-882–918, 929–1122).

In its response, BabyBus conceded the protectability and enforceability of Moonbug's registered copyrights.  (1-ER-114; 18-SER-3878.)  BabyBus also conceded that it willfully infringed copyrights in some of the most popular CoComelon episodes—*Boo Boo Song*, *Yes Yes Vegetables*, *Colors Song*, *Bath Song*, *Car Wash Song*, and *Yes Yes Playground*—to make early, foundational episodes of Super JoJo.  (1-ER-114–15; 9-SER-1690–92; 18-SER-3889.)  By copying these CoComelon episodes, BabyBus necessarily copied the character of JJ as he was depicted in those episodes, including his personality, actions, animation style, color design, and relationship with his family.  (3-SER-689, 691; 10-SER-2041–43, 2049–54; 18-SER-3937.)

Although BabyBus otherwise disputed the infringement, it did so mainly by disputing the copyright protectability of the JJ character and other elements of the CoComelon videos.  (18-SER-3897–3905.)  BabyBus submitted three expert reports, none of which analyzed similarity between the CoComelon and Super JoJo

works.  (5-ER-891–948, 956–1186; Dkt. 194-19.)  Instead, the experts opined that the individual elements of expression in CoComelon could be found *individually* in the "prior art."  (5-ER-1020; *see* 5-ER-987–1071.)  Even so, BabyBus' main expert on this issue testified at deposition that the JJ character was clearly delineated and contained original expression, and found no character with all of JJ's physical and conceptual qualities.  (18-SER-3917–20.)

The district court concluded that Moonbug's registered copyrights covering dozens of CoComelon videos and 2D artwork were valid and enforceable, including a registration for the 2D artwork of JJ.  (1-ER-106, 114.)  It also found that CoComelon's JJ is a copyright-protectable character because there was "no genuine dispute" that JJ was an especially distinctive character.  (1-ER-117.)  The court identified JJ's hair, signature onesie, and signature "Wow!" move as examples of elements that, "when combined with his other traits," such as "his personality that combines behaviors of a young baby . . . and an older child," render JJ "especially distinctive."  (1-ER-117–19.)  The court noted that even though such traits might not be copyrightable "standing alone," when viewed in combination, they crossed the threshold for copyrightability.  (*See* 1-ER-120.)

The district court entered partial summary judgment for Moonbug on the concededly infringing videos, but otherwise found that infringement should be resolved by the jury.  (1-ER-105–35.)

11

## IV.    The Evidence at Trial Overwhelmingly Favors Moonbug

### A.    The Jury Hears Extensive Evidence that the CoComelon Works Are Copyright-Protectable

At trial, three CoComelon artists and animators testified to the combination of elements uniquely expressed to create the CoComelon works, including JJ and other characters, and described their creative choices in selecting and arranging those elements with detailed examples from multiple CoComelon copyrighted works.  (8-SER-1588–1606, 1626–31, 1633–36; 9-SER-1659–66.)

Moonbug's expert, Professor Krause, also testified about the combination of elements that make up the protectable expression of the CoComelon works.  He described why JJ is an especially distinctive character.  (*See, e.g.*, 10-SER-1984–88 (JJ's physical elements), 1988–89 (JJ's expression of elements, movement), 1989–91 (JJ's personality, traits, "wow" animation).)  Professor Krause also described the combination of elements that makes up the protectable expression of the other CoComelon works.  (*See, e.g.*, 10-SER-1991–93 (family characters and relationships), 1994–95 (cinematography), 1995–96 (song structure and relationship to story structure), 1996–97 (style), 1997 (themes and mood), 1997–98 (color design), 1998–99 (animation), 1999 (sequence and pace), 1999–2000 (artwork and audiovisual works), 2002 (character development).)  He further explained how characters' personalities develop through storylines and over multiple episodes, and then walked through an example CoComelon work to

12

illustrate the identified protectable expression. (*See* 10-SER-2000–02, 2004–05, 2014–15; 6-ER-1285.)

Professor Krause focused on the selection and arrangement of the elements that make up the unique style of CoComelon, noting that what makes the show "recognizable" as CoComelon is that it expresses "[a]ll of those different elements" in a particular, "creative way that says something specific about their show." (10-SER-1982–83.) He noted that he saw no way "that a show could take any one of these elements and make it so specific that that could run a whole show," rather it must express its creativity in "many different ways" to be compelling and recognizable. (10-SER-1982–83; *see also* 10-SER-1984–2000.) Krause further testified that his protectability analysis focused on "the combination of those elements and how they're used" in CoComelon. (10-SER-2097–98.) He also confirmed that he filtered out unprotectable elements and ideas when performing his analysis. (10-SER-2000–02.) To illustrate this, he explained filtering out the idea of a baby in a crib. (10-SER-2000.) For *Swimming Song*, he explained how he filtered out the pool and the idea of a "kid being afraid to go in the pool because a lot of kids are afraid to go in the pool," noting also that there are "a lot of different ways" to "show" such a fear. (10-SER-2039.) He repeatedly testified that it is not just individual elements, but the combined unique expression of those elements, that is protectable in the CoComelon Works.

13

## B.    The Jury Hears Extensive Evidence that BabyBus Willfully Infringed the CoComelon Works

The jury heard that BabyBus' pre-production master plan for Super JoJo was to copy CoComelon.  (*See* 1-SER-120; 9-SER-1821–22; 10-SER-1966; 15-SER-3331 (BabyBus chose CoComelon "as the target setting" for Super JoJo), 3271, 3285, 3301; 16-SER-3353–54 (BabyBus' "master plan" to focus visuals of Super JoJo on JJ), 3413 (BabyBus' instructions to employees to make Super JoJo episodes as identical or similar as possible to CoComelon).)  It heard that BabyBus referenced CoComelon's JJ when designing and developing JoJo (1-SER-112–13; 10-SER-1962, 1965) and rejected alternative designs for JoJo that were dissimilar to JJ (12-SER-2558–59, 2611–12; 16-SER-3425–32, 3494–99; 17-SER-3863).  It heard that BabyBus traced CoComelon's JJ and certain family characters to create its JoJo character and his siblings.  (9-SER-1866, 1868–70; 16-SER-3397, 3407.)  And it heard that BabyBus downloaded hundreds of CoComelon materials and modified early CoComelon videos to create early Super JoJo episodes.  (*See* 9-SER-1866, 1868–70; 16-SER-3397, 3407.)  BabyBus also admitted to willfully infringing the registered copyrights in six CoComelon videos to create corresponding Super JoJo episodes, which it published in over 220 different URL locations on United States platforms.  (9-SER-1690–91, 1720–33, 1765–69; 14-SER-2841.)

14

Naiyong Yan, BabyBus' co-founder and corporate representative, also admitted repeatedly to plagiarizing artwork relating to fifteen CoComelon videos, including multiple asserted works. (9-SER-1720–33, 1765–69.)

The jury was also aided by the testimony of Professor Krause, who explained his opinion that Super JoJo infringes protectable expression of the CoComelon works. Professor Krause detailed the basis of his opinion that BabyBus copied protectable expression, including his analysis of the extensive similarities between JJ and JoJo. (10-SER-2008–12 (visual similarities between JJ and JoJo), 2012–13 (same for conceptual similarities), 2013–14 (same for stories), 2014–15 (same for mood and movement), 2016–17 (range of character expression), 2018–19 (sculpt/model), 2019–21 (redesigned JoJo character).) He also explained the basis of his opinion that BabyBus copied a combination of other elements protected by the CoComelon works. (*See* 10-SER-2043–46 (visual aspects, themes, moods, color, cinematography, and interaction with songs).) Professor Krause explained his opinion that all Super JoJo episodes infringed a CoComelon work:

> So that even if they have an episode that isn't a direct shot-by-shot, sequence-by-sequence copy, the [JJ] character itself is being copied and that is why I would say that even if they're not copying the exact sequence of events, they're still copying the protectable expression of the CoComelon original episodes . . . cinematography that's the similar style between the two shows . . . the color design, the pacing of the show, the editing.

15

(10-SER-2042–43; *see also* 10-SER-2021–58.)

The jury was given copies of all the copyrighted CoComelon works and the hundreds of Super JoJo episodes that were in evidence. (*See, e.g.*, 6-ER-1232–1314; 15-SER-3201–02, 16-SER-3484–93, 3500–04, 3600–3737; 17-SER-3738–43.) It also received both parties' YouTube channel pages with video thumbnails. (16-SER-3433, 3580.)

### C. The Jury Hears No Defense Expert Testimony on Protectability and Infringement

Despite submitting reports from three liability expert witnesses at summary judgment, BabyBus called only one at trial, a content distribution executive who did not analyze the CoComelon works or infringement. (*See* 12-SER-2408, 2441–42.) The other two liability experts were in court nearly every day (*see, e.g.*, 14-SER-2845), but BabyBus instead relied on the lay testimony of its co-founder, Yan (*see, e.g.*, AOB 32 (citing 2-ER-286–305), 47 (citing 3-ER-338–39).) On direct, Yan refused to say whether BabyBus' Super JoJo works copied CoComelon or were independently developed, stating that such questions were for an "expert or a professional" so he would "not be able to provide" an answer. (*See, e.g.*, 9-SER-1718, 1869, 1882.) But when recalled to the stand two weeks later by BabyBus, Yan readily compared the works and denied copying. (14-SER-2842.) The jury also heard that Yan testified in his deposition that BabyBus did not copy videos that it later conceded it willfully infringed (14-SER-2843) and that Yan lied to

16

YouTube under penalty of perjury (9-SER-1750–51, 1760; 15-SER-3320; 17-SER-3858).

### D. The Jury Hears BabyBus' Independent Development Defense Fall Apart

As explained above in Section II, the jury learned that BabyBus' independent development defense was based on perjury and evidence that BabyBus represented was from 2016, but that it in fact manufactured for trial years later.  (9-SER-1903, 1907; 10-SER-2062–67; 12-SER-2585–86; 16-SER-3525.)

## V. The District Court Carefully Prepares the Jury Instructions and Verdict Form

The parties submitted proposed instructions and verdict forms to the district court before trial.  (2-SER-492; 3-SER-501, 643.)  The district court then issued multiple rounds of draft instructions and verdict forms, allowing the parties to brief their objections in each round.  (1-ER-70; 4-ER-773, 823; 1-SER-12, 19, 26, 33, 40, 85, 87, 91, 128, 214, 220, 229, 240, 245, 252; 2-SER-255, 339, 346, 385, 397.) The court also held a charging conference during trial.  (14-SER-2997–3044.)

### A. Selection and Arrangement Instructions

The court instructed the jury that they may find "a particular selection and arrangement of otherwise unprotected elements is original enough to be protected if those elements are numerous enough and their selection and arrangement are original enough that their combination constitutes an original work of authorship."

17

(1-ER-81; *see* 1-ER-79, 85–86; 1-SER-53, 136–37; 7-SER-1416–18; 15-SER-3079–81, 3083.)

### B. Extrinsic Test Filtering Instructions

For the extrinsic similarity component of infringement, the court instructed the jury to (1) "identify similarities between each disputed copyrighted work and the accused works," (2) "filter out all the similarities" that are based on elements "not protected under copyright law," and (3) determine whether the protected elements or combination of elements in the asserted copyright works are substantially similar to the accused works. (15-SER-3082–84.) The court instructed the jury that elements unprotected by copyright include those that are "not original," "in the public domain," merely an "idea, concept, objective fact, or actual event," and scènes à faire elements discussed in more detail below. (15-SER-3079.)

On filtering, BabyBus originally argued in its proposed jury instructions that "[i]t is well settled" that "the fact finder must 'filter out' the unprotectable elements of the plaintiff's work" and proposed an instruction that it argued "provides the jury with guidance on how to determine which, if any, elements of the asserted works are not protectable so they can conduct that required filtering." (3-SER-562–63; *see also* 2-SER-366 (BabyBus' June 26, 2023 proposal to instruct

the jury that "<u>You must determine whether each other element is protected or</u> <u>not.</u>").)

### C.    Scènes à Faire Instructions

The court instructed the jury that a copyright does not protect elements if they are (1) "indispensable and naturally associated with the treatment of a given idea" (7-SER-1418–19); (2) "commonly used or firmly rooted in the tradition of the genre to which the work belongs" (7-SER-1418–19; 15-SER-3083); or (3) "merely standard, stock, or common to a particular subject matter or medium" (15-SER-3079).  The court's instructions specified that elements of "characters, plots, themes, dialogue, mood, setting, pace, colors, animation style, sequence of events, [or] music" would be unprotected if they were stock or standard.  (*See* 15-SER-3082–83.)  The court also instructed the jury that a compilation and arrangement would be unprotected if it was a "trivial variation[]" or "an age-old practice firmly rooted in tradition and so commonplace that it has come to be expected."  (15-SER-3079.)

### D.    Verdict Form and Virtual Identity Jury Question

Near the end of trial, the district court proposed adding a question to the verdict form asking the jury whether it found JJ and JoJo virtually identical.  (15-SER-3052.)  BabyBus agreed and a virtual identity question was added.  (2-ER-

19

150; 1-SER-18; 15-SER-3054.)  BabyBus also agreed that no jury instruction further defining the "virtual identity" standard was needed.  (15-SER-3054.)

## VI.    The Jury Renders a Verdict for Moonbug

After three days of deliberations and several rounds of questions to the district court (*see* 15-SER-3215–40, 3244–54), the jury rendered a verdict for Moonbug, finding BabyBus liable for willful infringement of thirty-nine CoComelon works and copyright misrepresentation for lying to YouTube under penalty of perjury in a DMCA notice.  (2-ER-145–49; 15-SER-3260–66.)

The jury also determined that BabyBus' JoJo character was "not only substantially similar[] but also virtually identical" to CoComelon's JJ character. (2-ER-150.)

## VII.   The District Court Denies BabyBus' Posttrial Motions and Sanctions BabyBus

Following trial, the district court imposed monetary sanctions on BabyBus for using fabricated evidence to support its failed independent development defense, holding that it was "inexcusable," "not merely an 'innocent mistake,'" and "in bad faith with an improper purpose."  (1-SER-9.)

The district court denied BabyBus' motions for a new trial and for judgment as a matter of law (1-ER-2) and granted Moonbug's motions for an injunction and attorneys' fees (1-ER-55; Dkt. 711).

20

## VIII.  BabyBus Appeals

BabyBus appealed, but does not challenge the sanctions or the denial of judgment as a matter of law.

### SUMMARY OF THE ARGUMENT

1.     The district court correctly held on summary judgment that JJ was protected by copyright.  BabyBus conceded that JJ has both physical and conceptual qualities and that he is recognizable wherever he appears.  The overwhelming evidence shows that JJ is sufficiently distinct, and BabyBus' counterargument improperly compares different isolated traits from many other characters to overly abstracted elements of JJ rather than analyzing JJ as a combination of specific, expressive elements.  Alternatively, BabyBus conceded that the copyright in the artwork depicting JJ was valid and the jury found that the characters were virtually identical.  Thus, even if the district court had not held that the whole character was protectable, the jury's verdict must be sustained based solely on JoJo infringing the visual depiction of JJ.

2.     The district court did not abuse its discretion in formulating its selection and arrangement instruction.  There was extensive testimony supporting a selection and arrangement theory, including by three CoComelon animators and an award-winning expert animator and professor of character design.  BabyBus' argument that the court itself was required to enumerate any selection and

21

arrangement is wrong.  The district court accurately instructed the jury on the legal principles governing a selection and arrangement theory and properly left the rest to the jury.

The district court also did not abuse its discretion in formulating its filtering instructions.  The district court instructed the jury to filter unprotectable elements in performing the extrinsic similarity test and gave ample guidance on what elements were unprotectable.  The protectability of elements is a mixed question of fact and law that was properly determined by the jury with guidance on the legal standards.  BabyBus itself argued that determining unprotectable elements was for the jury, and only reversed its position well into the trial.  Finally, any error in the filtering instructions was harmless because Moonbug relied on a selection and arrangement theory that can include unprotectable elements, and because the jury found JoJo virtually identical to JJ.

3.    The court was well within its discretion to use a general verdict form to determine the ultimate issues of infringement, willfulness, and damages.

ARGUMENT

I.   **The District Court Correctly Granted Partial Summary Judgment That CoComelon's JJ Was a Protectable Character**

A.   **The District Court Applied the Correct Character Delineation Test**

Copyright protection extends not only to an original work as a whole but also to sufficiently distinctive elements, like characters, contained within the work. *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015). A character is entitled to copyright protection if it (1) has "physical as well as conceptual qualities," (2) is "sufficiently delineated to be recognizable as the same character whenever it appears," and (3) is "especially distinctive" and "contains some unique elements of expression." *Id*. The district court correctly applied this three-element test to hold that JJ is protected by copyright. (*See* 1-ER-116–20.)

B.   **BabyBus Does Not Dispute That JJ Meets the First Two Elements**

BabyBus does not dispute that JJ meets the first two elements of the character delineation test—that he has physical as well as conceptual qualities and is sufficiently delineated to be recognizable as the same character whenever he appears. (AOB 50; 1-ER-116–17; 18-SER-3918–19.) BabyBus' argument instead focuses exclusively on the third element—whether JJ is sufficiently distinctive and has unique elements of expression. (*See* AOB 50–57; 1-ER-117–20.)

23

### C.    JJ Meets the Third Element Because He Is Especially Distinctive

Moonbug presented overwhelming evidence that JJ is especially distinctive and has unique elements of expression.  Krause described 29 of JJ's physical and conceptual characteristics and explained that JJ was a distinctive *combination* of the *specific expression* of these elements.  (*See* 3-SER-682; 5-SER-878 ("Although it may be true that other baby characters may have these traits alone or in combination, it is the way JJ expresses these traits, and the way these traits combine into a whole, that makes the character of JJ one that I consider distinctive, recognizable and original.").)

JJ is especially distinct from other characters.  (*See* 3-SER-682; 5-SER-881– 82.)  Physically, JJ has a combination of specifically expressed attributes that are especially distinctive and unique.  (*See* 5-SER-881.)  JJ's animation gives him distinctive character pacing and movement, which comes from creative choices such as the timing and progression of specific poses and facial expressions.  (5-SER-883–84.)  JJ also has especially distinctive and unique conceptual qualities. JJ's conceptual qualities were designed to be aspirational, not realistic, so he could be a role model for younger children.  (*See* 8-SER-1517–19, 1522, 1539, 1572– 74.)  Although JJ appears to be a young baby wearing a bib and being fed in a highchair, he also walks on two legs with ease, dances, speaks in full sentences, sings, and seems to understand everything other characters say to him.  (*See* 5-

SER-881, 909; 10-SER-1982.)  He also makes use of a particular signature "wow!" move to express his excitement or celebration.  (5-SER-883–84; 10-SER-1990–91; 11-SER-2173.)

There is also ample indirect evidence that JJ is especially distinctive. TomTom—JJ's older brother—was originally the main character of CoComelon. (3-SER-712; 5-SER-854, 879; 9-SER-1683–84.)  But JJ quickly became the star of CoComelon after he was introduced and shot up in popularity, and the roles of the family characters came to focus on supporting JJ and his development.  (3-SER-712; 5-SER-854, 879; 9-SER-1683–84.)  Now the central character of CoComelon, JJ is a key element in CoComelon becoming one of the world's most popular shows and garnering billions of views across YouTube, Netflix, Hulu, Amazon Prime Video, AppleTV, Roku, Cartoon Network, and Peacock.  (*See* 3-SER-712; 5-SER-882 ; 8-SER-1530–32, 1542; 11-SER-2184–85; 16-SER-3578.)  Fans recognize JJ as the center of the CoComelon series, with many searching for CoComelon using "JJ" as the keyword.  (11-SER-2187.)  JJ is so compelling that he has attracted millions of dollars in merchandise sales, including JJ dolls.  (3-SER-712–13; *see* 8-SER-1542.)  This shows JJ is a distinct character, not merely a stock character as BabyBus argues.

BabyBus' argument is also belied by BabyBus' meticulous copying of every detail of JJ to create its JoJo character.  BabyBus' preproduction planning

documents are filled with images of JJ and instructions to its team to make JJ the

"Focus of the visuals" of its Super JoJo series.  (*See, e.g.*, 5-SER-863–64; 16-SER-

3353–54.)  BabyBus considered and rejected a wide range of designs for JoJo that

were different from JJ:



(*See* 10-SER-2017; 16-SER-3425–32, 3494–99; 17-SER-3863; *see also* 5-SER-

864–65; 16-SER-3344–45, 3523, 17-SER-3864.)  Instead of differentiating its

character, BabyBus bought a commercially available rig—shown in BabyBus'

Opening Brief as "Licensable character"—and replaced most of it to recreate the

specific expressive details of JJ.  (*See* AOB 53; 5-SER-865–66, 1124–30; 10-SER-

2018–19.)  For example, BabyBus changed the rig's (1) bodily proportions to be

closer to JJ; (2) head shape from a taller, oblong head to a rounder head with a

slight indentation above the ear like JJ; (3) hair and eyebrows from using

26

individual strands to blocky hair like JJ; and (4) eyes by flattening them on the bottom and adding a depression to the areas above and below the eye to make them look more like JJ; and (5) nose from having a sharper transition to more of a button nose like JJ.  (3-SER-657–58; 5-SER-865–66, 1124–30.)  BabyBus' copying resulted in the JoJo character that the jury found was virtually identical to JJ:



| CoComelon's JJ | BabyBus' JoJo | BabyBus' JoJo |
|---|---|---|
| (16-SER-3434; *see* 6-ER-1311.) | (16-SER-3500.) | (16-SER-3503.) |

(*See* 2-ER-150; 3-SER-693; 5-SER-907.)  BabyBus *admits* that it used this JoJo character in six willfully infringing videos that were frame-by-frame copies of CoComelon (1-ER-114–15; 9-SER-1690–92; 18-SER-3889)—meaning that the JoJo character within them appropriated JJ's *very movements*, including his personality, animation, and relationships with family members.  (*See* 5-SER-886–906.)  But more than that, BabyBus copied JJ's stories, and audiovisual characters like JJ are established through stories in episodes.  (*See* 9-SER-1692 (BabyBus'

co-founder admitting that the early episodes had JoJo "in similar places," doing "similar moves," and having "similar expressions" as JJ); 10-SER-2053; *see also* 10-SER-2052 ("The story is what makes the character more than an initial description or anything else.").)  BabyBus would not have rejected numerous non-infringing designs and spent so much effort to copy every aspect of JJ if he were an indistinct, stock character.

BabyBus was so concerned about its copying of JJ that it fabricated fraudulent evidence to convince the district court that its infringing JoJo character had developed from an older BabyBus character named DouDou instead. BabyBus took its DouDou character and created—from scratch—new head, hair, and mouth elements to make them a closer match to JJ's.  (10-SER-2064–67; 18-SER-3873–74.)  BabyBus then represented to the district court that this version depicted the character as it existed in 2016, before JJ was created, when in fact it was created during litigation in 2021.  (*See* 1-SER-2; 10-SER-2064–65; 18-SER-3866.)  BabyBus' modification of DouDou to mirror JJ's facial details belies BabyBus' claim that JJ's features are not especially distinctive.

### D.    BabyBus' Arguments that JJ Is Not Especially Distinctive Fail

#### 1.    BabyBus Focuses on JJ's Characteristics Too Generally and Overlooks Specific Expression

BabyBus' arguments dismissing the distinctiveness of JJ's physical characteristics—his head, cheeks, eyes, and tuft of hair—focuses on too small a

28

subset of elements and characterizes them at too high a level of generality.  (*See*

AOB 53.)  Moonbug presented much more specificity on JJ's expression of those

attributes:

> He has a large head, but his head is also round, and when seen from
> the front, a slight flatter area above the ears.  This helps to give him a
> chubby-cheeked appearance.  He has big eyes, but they also have big
> pupils.  The eyes are far apart, but they are not pushed to the edges of
> the head.  They have a slight indentation below them to give him a
> more "chubby cheeked" appearance and help accentuate his smile.
> His tuft of hair is solid and does not appear as individual strands of
> realistic hair.  His hair has a prominent curl.

(5-SER-881; *see* 10-SER-1986.)

BabyBus' cursory analysis of JJ's expressive elements is exemplified by its

statement that "at least five prior cartoon babies had 'a singular, monocolored tuft

of hair above their forehead' like JJ."  (AOB 54.)  BabyBus ignores that JJ's hair is

specifically expressed as a solid lump rather than individual strands.  *See* 5-SER-

881; 10-SER-2011.  This distinction makes a difference—it is one of many of JJ's

elements that makes him distinct from other characters.  *See, e.g.*, 1-ER-118; 10-

SER-2112–14 (distinguishing Jack Jack from The Incredibles); 11-SER-2161–63

(same for Johny from LooLoo Kids).

BabyBus also fails to address JJ's other physical characteristics that,

combined with those above, differentiate even the static image of JJ from other

cartoon babies.  (*See* 3-SER-682; 5-SER-881.)  These elements include JJ's

(1) button nose with no prominent bridge, with the nostrils just visible when seen

from the front; (2) half-moon shaped smile with subtle lips; (3) two upper front teeth; and (4) brown eyebrows that are solid shapes like his hair rather than individual strands.  (3-SER-682; 5-SER-881.)

Nor does BabyBus address JJ's distinct animation style.  BabyBus' focus on analyzing characters through only static images "is fundamentally at odds" with the way this Court analyzes copyright claims because they are "not dynamic enough to capture the full range of creative expression" in an animated character. *See Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 942, 944 & n.12 (9th Cir. 2023) (finding error to analyze choreographic work as a series of static poses because choreography is "tied closely to movement").  JJ's animation gives him distinctive character pacing and movement, which comes from creative choices such as the timing and progression of specific poses and facial expressions.  (5-SER-883–84.) The record is filled with examples of CoComelon's JJ (left) and BabyBus' JoJo (right) performing the same gestures in a similar manner and pace:



(*See* 3-SER-693; 16-SER-3489, 3605; *see also* 3-SER-689, 691, 707; 6-SER-1140;
18-SER-3937.)  One example, shown in a snapshot in the upper right of the image
above, is that JJ often performs a unique animated gesture where he excitedly
throws his arms in the air and says "wow!"  (1-ER-119; 3-SER-693; 5-SER-883–
84.)  BabyBus' expert could not find any other character that performed this
animation.  (18-SER-3917; *see* 5-ER-1002.)

　　*Daniels v. Walt Disney Co.* does not support BabyBus' argument that JJ is
not distinctive because JJ is unlike the characters in that case.  958 F.3d 767 (9th
Cir. 2020).  *Daniels* held that anthropomorphized versions of emotions were not
especially delineated or distinctive because they had inconsistent appearance,
names, personalities, and assigned moods.  *Id.* at 773.  *Daniels* does not apply here

31

because there is no allegation that JJ's appearance or other attributes dramatically change over iterations and there is no dispute that JJ is well-delineated.

*Olson v. National Broadcasting Co.* does not apply to JJ either because it dealt with characters "depicted only by three- or four-line summaries" in a written screenplay. 855 F.2d 1446, 1452 (9th Cir. 1988). In contrast, JJ is an animated character featured in thirty-six copyrighted videos. Even if a brief textual description of a character is not copyrightable, that same character may be copyrightable once "drawn and named and given speech." *Gaiman v. McFarlane*, 360 F.3d 644, 661 (7th Cir. 2004).

### 2. Other Cartoon Baby Characters Do Not Make JJ Unprotectable

Elements of a character should be viewed in combination, not in isolation. An analysis myopically focused on individual elements of a character is not useful—every character "has elements that are not original." *Bach v. Forever Living Prods. U.S., Inc.*, 473 F.Supp.2d 1127, 1135 (W.D. Wash. 2007). Instead, "courts look to the *combination* of those elements to determine whether the character is protectable." *Id.* at 1135–39 (emphasis added) (holding that "an ordinary seagull named Jonathan Livingston Seagull who is determined to fly higher and faster, who transcends his beginning, and who teaches others to do the same" is a well-defined character). But BabyBus never analyzed JJ as a whole.

32

BabyBus instead considers the elements of JJ in isolation. (*See* AOB 55 (arguing that "[n]one of JJ's *characteristics* rise to the level of being 'especially distinctive'") (emphasis added); 5-ER-987 (BabyBus' expert: "the Allegedly Similar *Elements* identified by Moonbug are not original to Moonbug") (emphasis added).) In support of its non-distinctiveness argument, BabyBus thus constructs something of a Frankenstein's monster comprising different traits from unrelated characters: the name of a small blue CGI jet plane named "Jay Jay;" the tuft of hair from a porcelain doll; the opaque eyebrows of the cartoon monkey Curious George; the large eyes of animated lion cub Simba from Disney's Lion King; the upper front teeth of a cartoon mouse; the half-moon smile of a fish; and so on. (*See* AOB 55; 5-ER-988–1008.) But BabyBus provides no authority that comparing isolated traits from a menagerie of characters—particularly ones far afield from the cartoon human baby here—has any bearing on the copyrightability of a character.

BabyBus otherwise fails to show that JJ is not distinctive. BabyBus did not find a single character with all the visual and conceptual qualities of JJ. (18-SER-3917–18; *see* AOB 53 (arguing that "many" but not all of JJ's traits "can be found in other animated toddlers").) Further, BabyBus' reliance on static images alone is not a valid basis to compare animated characters. (*See* 11-SER-2174–75 (selecting static images to compare animated characters is "a choice" that can be used to

33

make dissimilar characters look similar and vice versa).)  JJ is an especially

distinctive character, and BabyBus provided no contrary evidence.

> 3.    A Planning Document Describing JJ as a "Quintessential Every
>        Kid" Does Not Make JJ Unprotectable

The Court should reject BabyBus' argument that a single planning document

describing JJ as a "quintessential every kid" somehow makes JJ unprotectable.

(*See* AOB 53.)

First, BabyBus did not submit or make arguments about this planning

document to the district court on summary judgment.  (*See* 18-SER-3878.)

BabyBus cannot argue that the district court erred in its order on summary

judgment based on a document that BabyBus did not put before the court.

Second, there is no rule that a relatable character is not protectable by

copyright, nor would such a rule make sense.

Third, the "quintessential every kid" quote from the document is cherry-

picked from a larger, detailed description of JJ that runs for three paragraphs and

describes many other characteristics.  (*See* 6-ER-1325.)  Rather than the end goal,

CoComelon's designers *started* with a "quintessential every kid" as a foundation

but then tried to "elevate that" and make him a "unique" character that is "beyond

the normal kid in terms of how he acts and interacts with the world."  (*See* 8-SER-

1572–74.)  For example, CoComelon designers made JJ more emotionally mature

34

than a typical toddler and emphasized his curiosity and optimism to make him an "aspirational" role model.  (8-SER-1572–74.)

Fourth, the entire JJ character cannot be reduced to a snippet of descriptive text to argue that he is not copyright protected.  *See Gaiman*, 360 F.3d at 661 (holding that even if a brief textual description of a character is not copyrightable, that same character may be copyrightable once "drawn and named and given speech.").  JJ's character, relationships, and animation were developed in dozens of copyrighted videos and transcend this snippet of text.

4.    The Court Should Reject BabyBus' Invented Standard

BabyBus invents a standard that a copyrighted character must be "recognizable despite changes in appearance."  (AOB 5, 55.)  The court should decline to adopt this novel approach.

BabyBus takes a passage from *Towle* out of context, which explained that characters may be copyrightable "even if the character does not maintain the same physical appearance in every context."  802 F.3d at 1020.  In *that* context, the Court held certain famous characters whose appearances changed drastically from work-to-work were protected if they could still be recognized as the same characters.  *Id.*  The Court did not set up a test that animated characters—especially those drawn in a consistent way—must be recognizable by their character traits alone no matter how they are drawn.

35

But even BabyBus' invented standard is satisfied. The only relevant evidence shows that JJ is recognizable even if drawn differently. (*See, e.g.*, 5-SER-880 (JJ easily recognizable despite updating model to change textures and rigging).)

BabyBus also invents a standard that there must be "exceptional circumstances" for a character to be protected by copyright. (AOB 23, 52.) BabyBus is wrong again.

BabyBus cites no case applying an "exceptional circumstances" standard and cannot articulate how such a standard would work—precisely because that is not the test. While this Court has observed that purely *literary* characters are ordinarily not copyrightable, it later clarified this was dicta or an alternative holding. *See Towle*, 802 F.3d at 1019 n.5. And in any event, that observation is irrelevant here. *Towle* distinguished comic book characters from literary characters because the former have "physical as well as conceptual qualities" and thus are "more likely to contain some unique elements of expression." *Id.* at 1019 (quoting *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978)). Even if protecting *literary* characters might sometimes require exceptional circumstances, that requirement would not apply to the *visual*, animated characters at issue here. (*See, e.g.*, 5-SER-848–49, 854–55, 880–81, 907–09.)

36

But again, even BabyBus' invented standard is satisfied. JJ is an exceptionally successful and recognizable character, the centerpiece of a world-leading show with millions of dollars in merchandise sales and billions of views.

### E.    Any Error in Finding JJ a Protectable Character is Harmless Because the Jury Found the Visual Rendering Alone Infringed

At summary judgment, BabyBus conceded the protectability and enforceability of Moonbug's copyrights in the visual rendering of JJ. (*See* 1-ER-114.) This includes a registered copyright for the 2D artwork of JJ:



(6-ER-1308–11.) BabyBus also conceded that the copyrights in dozens of CoComelon videos depicting JJ as a 3D animated character are valid. (*See* 1-ER-106, 114; 18-SER-3878.) BabyBus challenges only the district court's decision

holding that JJ is a protectable character *separate* from his visual rendering.  (AOB 5, 7, 15, 50.)

Any error in the district court's holding that the JJ character is protected by copyright apart from its visual rendering would be harmless.  The jury found that BabyBus willfully infringed the registered copyright in JJ's 2D visual rendering. (2-ER-145.)  The jury could have reached this verdict only by finding that the visual rendering of BabyBus' JoJo character infringed on the 2D artwork of JJ. *See Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply Inc.*, 106 F.3d 894, 902 (9th Cir. 1997) (examining the jury instructions and verdict to "determine what facts a rational juror must have found").  All of BabyBus' Super JoJo videos focus on JoJo as the main character.  (9-SER-1888.)  Thus, the jury's finding that BabyBus willfully infringed the visual rendering of JJ is alone sufficient to sustain the jury's verdict.

## II.    The District Court Did Not Err in Instructing the Jury

### A.    The Court Reviews the Jury Instructions for an Abuse of Discretion

The Court reviews a district court's formulation of jury instructions for an abuse of discretion.  *Wall Data Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769, 784 (9th Cir. 2006).  The Court reviews whether there is sufficient evidence to support giving an instruction for abuse of discretion, according the district court "considerable deference" because of the "district judge's proximity to the trial and

38

intimate knowledge of the record." *U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1136 (9th Cir. 2023).  The Court considers the district court's instructions "as a whole" and will not reverse if any alleged error is more probably than not harmless.  *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1065 (9th Cir. 2020).

### B.     The District Court Did Not Err in Its Instruction on Selection and Arrangement

#### 1.     The District Court Did Not Abuse Its Discretion by Giving a Selection and Arrangement Instruction

The district court did not abuse its discretion in deciding that a selection and arrangement instruction was warranted by the evidence.  Moonbug advanced a selection and arrangement theory from the beginning of the case.  (*See* 1-ER-124–29; 5-SER-877, 883–85; 6-SER-1212–13.)  And evidence at trial showed that JJ had a protectable selection and arrangement of elements.  (*See, e.g.*, 10-SER-2097–2118 (explaining that extrinsic analysis based on a combination of elements and how they were used), 1982–83 ("All of those different elements are what makes a show recognizable."), 1983 ("Q. And is it any particular single element?  A. No.  I mean, it—it really couldn't be.  There's—I don't think there's a way that a show could take any one of these elements and make it so specific that that could run a whole show . . . ."), 1985–87 (examples of elements), 1990 (expert opinion that it is "the combination of all these things" that make JJ creative); *see also* 8-SER-

1521–26, 1588–1606, 1629 (testimony from CoComelon animators discussing combination of elements in CoComelon videos); 10-SER-2042–43 (testimony on combination of elements for family characters).)

BabyBus' argument that the district court should not have given a selection and arrangement instruction because there was no evidence that elements were "particularly selected" is wrong. (*See* AOB 45–48.) BabyBus' statement that "the original designers of JJ and the CoComelon series did not testify" (AOB 45) is irrelevant because there is no requirement that an original designer testify to support a selection and arrangement theory. Although BabyBus notes that the original designers testified in *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989), that case does not hold that such testimony is required. Such a requirement would effectively destroy copyright protection for original selections and arrangements after all authors have died, which would conflict with the statutory scheme extending the term of copyrights beyond an author's death by decades. *See* 17 U.S.C. § 302.

Substantial evidence at trial supported a selection and arrangement theory. Three creative personnel who worked on the CoComelon series and an expert animator testified extensively about the CoComelon animation process and how expressive elements were combined to make the copyrighted works. (*See, e.g.*, 8-SER-1522 ("[T]he intentionality behind how we have our characters behave and

40

act and how we choose to represent real-life experiences is very intentional and heartfelt."), 1523 (discussing intentionality behind using environment, colors, and design to highlight characters), 1542–43 (discussing combination of JJ's facial elements as "key in making sure he looked like the character that our audience knows and love."), 1588–92 (animator of *This is the Way* discussing selecting expressive elements and his creative process in animating the video), 1592–96 (same for *Swimming Song*), 1596–1603 (same for *The Boo Boo Song*), 1603–05 (same for *Yes Yes Playground*), 1626–30 (same for *Yes Yes Vegetables*), 1633–36 (same for *Rock-a-bye Baby*); 9-SER-1659–62 (same for *Sick Song*), 1663–66 (same for *Colors Song*); *see also* 10-SER-2004–05 (expert animator discussing combination of elements).)

BabyBus also argues that a selection and arrangement instruction was improper because infringement was supposedly based on "random similarities." (AOB 46–50.) But this language from *Skidmore* was about comparing a scattershot of elements in "two vastly dissimilar" works in "a different aesthetic context" where the plaintiff "never articulated [a selection and arrangement] theory at trial." *See* 952 F.3d at 1075–76. None of this applies here. The works were in the same genre with the same aesthetic context and Moonbug articulated a selection and arrangement theory at trial. And the similarities were not "random"—BabyBus intentionally copied CoComelon's main character in his

41

entirety, even tracing over CoComelon videos and characters and issuing planning documents with instructions to copy.  *See* Statement of the Case, Parts II and IV.B. BabyBus also admitted that many of its earliest videos *willfully* infringed CoComelon copyrights.  (*See* 1-ER-114; 9-SER-1690–92; 18-SER-3889.)

> ### 2.    The District Court Did Not Abuse Its Discretion in Formulating Its Selection and Arrangement Instruction

The District Court did not abuse its discretion by giving a selection and arrangement instruction without expressly stating that a selection and arrangement cannot be based on random similarities.  (*See* AOB 48–50.)  BabyBus did not introduce or highlight any evidence that the similarities between CoComelon and Super JoJo were random.  (*See* 1-ER-46; AOB 48–49.)  The district court correctly instructed that a selection and arrangement of elements is protectable only if "those elements are numerous enough and their selection and arrangement are original enough that their combination constitutes an original work of authorship" and cannot be "[m]ere trivial variations" of "an age-old practice, firmly rooted in tradition, and so commonplace that it has come to be expected as a matter of course."  (1-ER-81; 7-SER-1418; 15-SER-3079–81.)  The district court did not abuse its discretion by declining to add extra gloss onto this standard about supposedly "random" similarities from BabyBus' favorite authorities.  *See Van Cleef v. Aeroflex Corp.*, 657 F.2d 1094, 1099 (9th Cir. 1981) ("A trial judge need

not incorporate every proposition of law suggested by counsel so long as he adequately covers the principles necessary for jury guidance.").

Nor did the district court err by "not explain[ing] the particular selection and arrangement being asserted." (*See* AOB 48.) BabyBus does not point to anywhere in the record where it objected on this ground, nor does it explain how the district court was supposed to explain the selection and arrangement—whatever that means. Because BabyBus failed to object on these grounds, this Court reviews for plain error. *See Skidmore*, 952 F.3d at 1065.

It appears that BabyBus' argument is that the district court was supposed to explain to the jury what was protectable as a selection and arrangement *sua sponte*. This Court has held that protectable elements do not need be identified in jury instructions. *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 989 (9th Cir. 2009) ("No case law or legal theory requires that 'protectable' elements be identified" in jury instructions); *see Williams v. Gaye*, 895 F.3d 1106, 1124–25 (9th Cir. 2018) (jury makes factual determination of what is in a copyright deposit); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) (jury can make "factual determinations regarding the extrinsic test" and "[i]t is well settled that a jury may find a combination of unprotectible elements to be protectible under the extrinsic test," even based on disputed expert testimony), *overruled on another ground by Skidmore*, 952 F.3d at 1066. In this case, the

43

selection and arrangement theories applicable to JJ the character, JJ the 2D artwork, the individual videos, and the family characters were explained through the testimony and Moonbug's arguments—it would have been unnecessary, complex, and possibly argumentative to restate the various overlapping theories in the jury instructions. It was not error, much less plain error, for the district court to not explain a particular selection and arrangement to the jury.

### C. The District Court Did Not Abuse Its Discretion or Misstate the Law in Formulating Its Filtering Jury Instruction

#### 1. The Instructions as a Whole Told the Jury Which Unprotectable Elements to Filter

The extrinsic test assesses whether there is "substantial similarity to *protected* elements of the copyrighted work," which requires the factfinder to distinguish between protected and unprotected material. *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004).

BabyBus' argument that the district court's instructions gave the jury inadequate guidance on how to filter out unprotected elements—and "abdicate[d]" its role to identify unprotected elements—fails to consider the instructions as a whole. (*See* AOB 26.) The district court gave ample guidance to the jury through extensive instructions that tracked BabyBus' theory of the case. The district court instructed the jury at the outset of trial that their assessment of the degree of similarity between works required them to "distinguish between elements or

44

arrangements of elements that are protected and those that are unprotected" and that "expression is not protectable if it is not original to the author—that is, if it already is in the public domain or consists of little more than mere ideas, concepts, actual events, or objective facts themselves." (*See* 1-SER-135–37; 7-SER-1417–19.) The court instructed the jury at the end of the case that unprotected elements to be filtered include:

> stock or standard concepts, characters, plot, themes, dialogue, mood, setting, pace, colors, animation style, sequence of events, music, and any other features that are commonly used or firmly rooted in the tradition of the genre to which the works belong, as well as other material that is part of the public domain or not original to the Plaintiffs.

(1-ER-85; 4-ER-655–56.) The court's instructions also told the jury that the following elements are unprotectable: (1) "[a] portion of the work that is not original to the author"; (2) "[a] portion of the work that was in the public domain at the time of creation by the author"; (3) "[a]n underlying idea, concept, objective fact, or actual event themselves, expressed or described in a work"; and (4) "[e]lements that are merely standard, stock, or common to a particular subject matter or medium." (1-ER-81; 4-ER-652.) The court also instructed the jury that "[o]nly the particular expression of an idea can be copyrighted and protected" and that copyright protection does not extend to "mere underlying ideas contained in the work." (1-ER-80; 4-ER-651–52.) The court's instructions, taken as a whole,

adequately instructed the jury on how to identify and filter out unprotectable elements.

### 2. The District Court Correctly Left the Fact-Intensive Issues of Protectability to the Jury

BabyBus' argument that the district court failed to instruct the jury by listing "specific elements of Moonbug's copyrights that were unprotectable as a matter of law, as well as protectable elements" is incorrect. (AOB 18.) The court's instructions did include a list of unprotectable elements using language from BabyBus' proposed instructions. (*See* 3-SER-598 (listing various elements that are unprotectable if "stock or standard" or otherwise "commonly used or firmly rooted in the tradition of the genre").)

The district court did not err by instructing the jury on the legal standards and relevant categories of expression needed to filter unprotected elements and letting the jury apply the law to the facts. Copyright protectability is a "fact-intensive" mixed question of fact and law. *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008); *see Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1073 (9th Cir. 2000); *Harper House*, 889 F.2d at 201. A mixed question that is not resolved at summary judgment is typically resolved by a jury. *See Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 422–23 (2015) (explaining that "tacking," a mixed question of law and fact in trademark law, "must be decided by a jury," noting that the assessment is "fact-intensive"). In such cases, the proper

46

role for the trial court is to "craft careful jury instructions that make [the legal] standard clear." *Id.* at 424; *see Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1163 (9th Cir. 2013) (jury instruction providing legal standard without specific examples was proper). Other circuits that have directly considered the issue hold that questions of copyrightability that make it past summary judgment should be resolved by the factfinder. *E.g.*, *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1517 (1st Cir. 1996); *Matthew Bender & Co. v. W. Publ'g Corp.*, 158 F.3d 674, 681 (2d Cir. 1998). It was not error for the district court to instruct the jury on the law and allow it to apply that law to the facts.

As a threshold matter, BabyBus' argument should be disregarded under the invited error doctrine. BabyBus repeatedly argued that the jury should determine whether elements were unprotectable to filter them out. In proposed pretrial instructions, BabyBus provided detailed instructions on unprotected matter and filtering for the jury, which the district court in large part adopted. (*Compare* 3-SER-562–63, 598–99 *with* 1-ER-81, 85–86.) BabyBus then argued that "the fact finder must 'filter out the unprotectable elements of the plaintiff's work'" and proposed giving three "examples of unprotected expression" to "provide[] the jury with guidance" on how to determine which elements were not protectable "so they can conduct that required filtering." (3-SER-562–63.) BabyBus wanted the jury instructed that it "may find that additional aspects of Plaintiffs' copyrighted works

47

are not protected" beyond the examples given.  (3-SER-563, 599.)  Later, BabyBus again proposed a jury instruction that gave only "examples" of supposedly unprotected expression in its pretrial objections and would have instructed the jury that it "must determine whether each other element is protected or not."  (2-SER-365–66.)  It was not until the close of trial, after several rounds of proposed instructions, that BabyBus contradicted its previous position and demanded that the court provide a long list of supposedly unprotectable elements in its instruction.  (*See* 4-ER-799.)  Under the invited error doctrine, because BabyBus proposed these instructions in the first place, it was estopped from taking a contradictory position and should not benefit from completely reversing its position in a belated filing.  *See United States v. Hui Hsiung*, 778 F.3d 738, 747 (9th Cir. 2015).

Alternatively, this Court need not resort to the invited error doctrine because the district court did not err.  The primary case BabyBus relies on—*Mattel*—is inapposite.  The trial court in *Mattel* instructed the jury using a list of specific protectable and unprotectable elements.  *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 916 (9th Cir. 2010).  This Court found two sources of error: (1) the list of unprotectable elements was incomplete, and (2) not all the listed protectable elements were protectable.  *Id.*  This error required reversal because the jury could have found similarity based on unprotectable ideas that were not on the court's list, such as the "depict[ion of] young, stylish girls with big heads and an attitude."  *Id.*

48

at 916–17. If anything, *Mattel* shows that presenting a jury with an enumerated list of specific protectable and unprotectable elements risks error by being over- or underinclusive. *See Chinaryan v. City of Los Angeles*, 113 F.4th 888, 906 (9th Cir. 2024) (holding that an instruction misstates the law if it lists examples but improperly suggests they are exhaustive). The district court here avoided that risk by detailing for the jury the appropriate legal standards to apply rather than a discrete list of elements that risked being over- or under-inclusive . (*See* 1-ER-42.)

None of the other cases BabyBus relies on hold that a district court must instruct a jury on filtering using an enumerated list of unprotected elements.

*Harper House* requires only that jury instructions are adequate to ensure that the jury fully understands the issues. 889 F.2d at 205. *Harper House* centered on a functional item—an organizer with blank forms and tabs—and the court instructed that the jury "need not be concerned with the organizers' copyrightability." *Id.* at 198–99, 206. The plaintiff's closing arguments "fully exploited" this instruction by asking the jury to compare unprotectable elements. *Id.* at 207 n.6. In contrast, the jury here was instructed on copyrightability, the case concerned audiovisual works rather than a functional item, and Moonbug emphasized that the jury's decision should *not* be based on unprotectable elements. (*See, e.g.*, 10-SER-2000–02, 2088–89; 10-SER-2101–02 (expert testimony on filtering); 15-SER-3104 (Moonbug in closing argument: "And then he says he

49

filtered out that protectable—the unprotectable expression.  Remember when he talked about, you know, just having a baby in a crib or eating at a highchair?  That's not what the copyrights are about.  They're about the specific expression of the character, his combination of elements, how he interacts with his family, his expressions, his mood, and the stories he's in.").)

Later cases applying *Harper House* confirm it is inapplicable here.  *Dream Games*, 561 F.3d at 989, focused on a primarily functional work requiring virtual identity for infringement as in *Harper House*, but declined to extend that case by holding a court did not need to identify protectable elements.  *Dream Games* reasoned that listing protectable elements would "have improperly limited the jury's consideration" to those elements rather than the work as a whole.  *Id.*  For unprotectable elements, *Dream Games* held that listing them "fairly and sufficiently explained the theory of the case and did not misstate the law."  *Id.*  But the Court did not hold that a list of unprotectable elements was a requirement in all cases or extend *Harper House* beyond functional works.  The district court's instructions here, as in *Dream Games*, adequately explained the law governing BabyBus' theory of the case, allowing BabyBus to argue to the jury that elements of CoComelon are unprotectable.  (*See* 15-SER-3129–63.)

In *Williams*, the Court rejected an argument that a trial court "erroneously instructed the jury to consider unprotectable elements" in a musical composition by

50

failing to list specific unprotectable elements. 895 F.3d at 1124–25. *Williams* held that *Harper House* was "easily distinguishable" because musical compositions are unlike organizers, which are primarily utilitarian and therefore receive "extremely limited protection." *Id.* at 1125. Similarly, the Court in *Skidmore* held that a district court adequately instructed the jury when it told them to compare the works by determining whether "any . . . musical elements that are original to Taurus . . . also appear in Stairway to Heaven" without listing which elements were unprotectable. 952 F.3d at 1076–77. *Williams* and *Skidmore* confirm that the district court did not err simply by failing to list specific unprotected elements in its filtering instructions.

*Rentmeester v. Nike, Inc.* does not support BabyBus either. 883 F.3d 1111 (9th Cir. 2018), *overruled on another ground by Skidmore*, 952 F.3d at 1066–67. Although *Rentmeester* did state that "the court must 'filter out' the unprotectable elements," it did so in reviewing the trial court's granting a motion to dismiss. *Id.* at 1116, 1118. While "it is undisputed that judges may resolve" mixed questions of fact and law in pretrial motions, it is the jury's role to resolve such questions at trial. *Hana*, 574 U.S. at 424. Thus, *Rentmeester* does not suggest that the district court erred by instructing the jury on the governing legal principles and allowing it to resolve the mixed questions of fact and law.

51

Even further afield, *Desire, LLC v. Manna Textiles, Inc.* held only that a district court must determine the "scope" of a copyright—i.e., whether a work is entitled to "broad" protection or "thin" protection, which affects how much similarity is required for infringement. 986 F.3d 1253, 1261 (9th Cir. 2021). *Desire* said nothing to require enumerating every specific unprotectable element for the jury.

3.    The District Court Properly Rejected BabyBus' Proposed Filtering Instruction

BabyBus' proposed instruction inappropriately listed various elements of JJ, JJ's family, and the CoComelon videos that were supposedly unprotectable in isolation. This proposed instruction would have invited error because many of the supposedly unprotectable elements listed were misleading, inaccurate, and unsupported by evidence at trial. For example, BabyBus proposed instructing the jury—without any citation to evidence—that a plot cannot be protected if it relates in any way to learning. (*See* 4-ER-803.) This was contradicted by the testimony of CoComelon creators, who described how there are many ways to express even a very basic plot idea, such as taking a bath or going to school. (*See* 8-SER-1538; 8-SER-1574–75.) And again, BabyBus did not put on *any* expert testimony at trial regarding what elements of CoComelon were or were not original.

Further, BabyBus' proposed instruction would have unduly amplified its theory of the case by listing its allegedly unprotected elements in granular detail,

52

which could have misled the jury into thinking that expressions of these elements were not protectable even as part of a selection and arrangement. Moonbug's theory was based on the protectability of a selection and arrangement of those elements, not the individual elements in isolation. (*Compare* 4-ER-799–803 (BabyBus' proposed instructions listing fifty-two allegedly unprotected elements and eight protected elements) *with* 15-SER-3104 (Moonbug's closing argument urging the jury to look "at the combination of expression" and that it is not any one element alone) *and* 10-SER-2097–98, 2105–06 (expert testimony about protectability of combination and not individual elements).) The district court has "substantial latitude" in tailoring jury instructions and was not required to add details to support BabyBus' theory of the case. *Brewer v. City of Napa*, 210 F.3d 1093, 1097 (9th Cir. 2000) (holding there is no requirement to give detailed instructions addressing the specifics of a case if the instructions allow a party "to argue his theory of the case to the jury"); *see Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 532 (9th Cir. 1986) ("The instructions must give the jury adequate guidance to intelligently determine the questions presented. If instructions are adequate, refusal to amplify them is not grounds for reversal."). It was not error for the district court to refuse to give a proposed instruction that emphasized BabyBus' arguments despite their inaccuracy and lack of evidentiary support.

4.    <u>Any Error in the Filtering Instruction Was Harmless Because Moonbug Relied on a Selection and Arrangement</u>

Any error in the district court's filtering instruction would be harmless because Moonbug relied on a selection and arrangement theory and did not argue that any of the elements in BabyBus' proposed filtering instruction was independently protectable. A selection and arrangement can include unprotected elements. *See Swirsky*, 376 F.3d at 848. Yet BabyBus incorrectly argues that the district court needed to instruct the jury using a list of specific, unprotectable elements despite Moonbug's selection and arrangement. *See* AOB 43–45.

"Filtering" and "selection and arrangement" are "different ways of evaluating whether a particular work infringed upon protected expression." *Hanagami*, 85 F.4th at 942 n.11. Filtering gauges whether protected elements of a work were unlawfully copied, while selection and arrangement assesses whether a protected expression as a whole was unlawfully copied. *Id.* BabyBus' theory— that the jury should filter out unprotectable elements in a selection and arrangement—improperly blends these two ways of evaluating infringement and makes little sense because a selection and arrangement can include unprotectable elements.

54

### D.   The District Court Did Not Abuse Its Discretion or Misstate the Law in Formulating Its Scènes à Faire Instruction

The scènes à faire instruction accurately stated that unprotected elements include those "that are merely standard, stock, or common to a particular subject matter or medium" and that "compilations and arrangements that are an age-old practice, firmly rooted in tradition, and so commonplace that it has come to be expected as a matter of course are not sufficiently original under copyright law to qualify for protection."  (1-ER-81; 4-ER-652.)  The court further instructed that unprotected elements include "stock or standard concepts, characters, plots, themes, dialogue, mood, setting, pace, colors, animation style, sequence of events, music, and other features that are commonly used or firmly rooted in the tradition of the genre to which the works belong."  (1-ER-85; 4-ER-655–56; *see also* 1-SER-135; 7-SER-1418–19 (preliminary instructions).)  These instructions accurately reflect the scènes à faire doctrine as described in *Satava v. Lowry*, 323 F.3d 805, 810 & n.3 (9th Cir. 2003) and afforded BabyBus an opportunity to argue its theory of the case to the jury.

BabyBus' proposed additional language that included elements that "naturally flow or are associated with the treatment of a given idea" (*see* 4-ER-807) would have added nothing to these instructions.  "A trial judge need not incorporate every proposition of law suggested by counsel so long as he adequately covers the principles necessary for jury guidance."  *Van Cleef*, 657 F.2d at 1099.

55

Many authorities describe the scènes à faire doctrine without BabyBus' preferred term, "naturally flow." *See Williams*, 895 F.3d at 1119, n.6; *Swirsky*, 376 F.3d at 850; *Satava*, 323 F.3d at 810.

And if BabyBus' proposed instruction could be viewed as adding something new, it would have been only to overstate the scènes à faire doctrine. In *Swirsky*, the doctrine was said to apply to "certain *commonplace* expressions [that] are *indispensable and* naturally associated with" the treatment of an idea. 376 F.3d at 850 (emphasis added). BabyBus' proposed instruction omitted the "commonplace" and "indispensable" limitations that qualified the otherwise overbroad term "associated." (4-ER-807.)

Further, BabyBus did not identify anything that would have been covered by its proposed instruction that was not covered by the instructions on "stock or standard concepts." (*See* 1-ER-45.) The example BabyBus now points to—*Swimming Song*—illustrates the flaws in its argument. (*See* AOB 32.) CoComelon animator Marvin Lee testified extensively about creating *Swimming Song* to tell a story about JJ's family teaching him how to swim and JJ overcoming his initial fear. (8-SER-1592–96.) But this idea did not dictate the expressive content of the video that BabyBus copied—including the unique specific scenes and camera angles that Mr. Lee developed using his imagination, such as the final composition of the CoComelon family positioned in a half-circle with their arms

56

spread out using a bird's eye view perspective.  (*See* 6-ER-1297; 8-SER-1595–96.)

BabyBus copied this unique expressive content, creating a copycat Super JoJo

*Swimming Song* by reproducing specific scenes and compositions from

CoComelon's video.  (*See* 9-SER-1700–19 (BabyBus testimony); 16-SER-3451

(planning document).)  There was also expert testimony from Mr. Krause

comparing the *Swimming Song* videos.  (10-SER-2033–59.)  The two videos speak

for themselves:



| CoComelon *Swimming Song* | BabyBus *Swimming Song* |
| --- | --- |

| CoComelon *Swimming Song* | BabyBus *Swimming Song* |
| --- | --- |



| CoComelon *Swimming Song* | BabyBus *Swimming Song* |
|---|---|



(*Compare* 6-ER-1297 (CoComelon *Swimming Song*) *with* 6-ER-1237 (Super JoJo *Swimming Song*); *see also* 3-SER-666, 696.)  The given instructions allowed BabyBus to argue that these similarities were based on unprotectable elements, such as stock, standard, or commonplace expression.  (*See* 1-ER-81, 85; 4-ER-652–56.)  The jury rejected BabyBus' argument because the evidence against it was overwhelming, not because of any subtlety in the instructions' phrasing.

### E. The District Court Did Not Abuse Its Discretion by Not Separately Instructing on Merger

The merger doctrine applies as a defense if an idea contained cannot be expressed in a wide variety of ways, but only one or a very small number of ways—generally factual or utilitarian works.  *See Allen v. Acad. Games League of Am., Inc.*, 89 F.3d 614, 617 (9th Cir. 1996).

BabyBus provides no evidence supporting the application of the merger doctrine beyond a bald assertion that it "applies to this case."  (AOB 33.)  Nor did it proffer any when the district court stated it would withdraw the merger instruction because "I don't think the evidence supports it."  (14-SER-2997.)

59

BabyBus likewise provides no legal authority applying the merger doctrine to expression in animated videos—which have a wide range of possible ways to express ideas.  *See* 1-ER-63–68; 8-SER-1538, 1574–75; *Mattel*, 616 F.3d at 916 (finding a "wide range" of expression for a doll).  Further, the merger doctrine is just another way of saying that "idea and expression may merge from [] 'stock' concepts," and the jury was adequately instructed that "stock or standard concepts" were not protected.  *Allen*, 89 F.3d at 617; 1-ER-81; 4-ER-652.  The only evidence at trial showed that there were many ways to express the ideas underlying the CoComelon works.  (*See, e.g.*, 8-SER-1574–75; 9-SER-1684; 10-SER-2016–20.) It was not error to omit BabyBus' proposed merger instruction, and any error would be harmless because of the instructions on stock concepts.

## F.  The District Court Did Not Err by Instructing the Jury to Apply a Substantial Similarity Standard

The Court distinguishes between "broad" and "thin" copyright protection "based on the 'range of expression' involved."  *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019).  If copyright protection is "broad," a work will infringe if it is "substantially similar" to the copyrighted work; if copyright protection is "thin," the works must be "virtually identical."  *Williams*, 895 F.3d at 1120.

The district court correctly instructed the jury to apply a substantial similarity standard to the CoComelon works because of their wide range of

expression. The district court noted that even "a cursory review of the animated babies in the genre" shows a wide variety and provided examples:



(1-ER-64–67.) A 3D animated character can vary in ways other than the static image too, such as behavior, personality, voice, and animation style. (*See, e.g.*, 8-SER-1519–20; 10-SER-2016.) And videos that portray such characters have an even wider range of expression, including plot, pace, and scene composition. (*See, e.g.*, 8-SER-1574–75.)

*Mattel* supports applying broad protection to the CoComelon works. *Mattel* held that a doll sculpt—"a mannequin-like plastic doll body without skin coloring, face paint, hair or clothing"—was protected only against virtual identity. 616 F.3d

61

at 908, 914.  But *Mattel* held that sketches of the dolls were entitled to broad

protection because they could "vary the face paint, hair color and style, and the

clothing and accessories, on top of making minor variations to the sculpt."  *Id.* at

916.  Animated characters like JJ have an even wider range of possible expression

than a sketch of a doll, and certainly more than a sculpt.  Even considering the

"quintessential every kid" reference to JJ, there was no evidence that there is a

narrow range of expression for a cartoon character.  *See Malibu Textiles*, 922 F.3d

at 953 (holding floral lace fabric pattern was entitled to broad copyright

protection).

BabyBus' argument that the district court ruled that the works were not

identical (AOB 37) should not disturb the verdict either.  The district court merely

noted that JJ and JoJo were not identical in declining to find infringement on

summary judgment.  (*See* 1-ER-127.)  It did not hold that no reasonable jury could

conclude the works were "virtually" identical.  It left that question for the jury, and

BabyBus does not challenge the sufficiency of the evidence supporting the jury's

finding of virtual identity.

### G.     Any Error in the Instructions Was Harmless Because the Jury Found Virtual Identity

Any error in the substantial similarity, filtering, scènes à faire, or merger

instructions was harmless because the jury found that JoJo was virtually identical

to JJ.  (*See* 2-ER-150.)  Even if JJ was entitled only to "thin" protection, BabyBus

would still be liable under the "virtually identical" standard.  *Mattel*, 616 F.3d at 914.  Moreover, the instructions for filtering, scènes à faire, and merger all cover closely related doctrines, and BabyBus' argument is the same for each—that the CoComelon works are supposedly so constrained by the underlying idea of the subject matter that the range of protectable expression is narrow.  BabyBus' argument is wrong, as discussed above.  But even if all three doctrines apply and JJ is entitled only to "thin" protection, there is still infringement if the central aspects of the parties' works are virtually identical.  *Ets-Hokin*, 323 F.3d at 766; *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1439 (9th Cir. 1994).

BabyBus wanted the jury to decide virtual identity (*see* 15-SER-3051–63, 3065–66), and the jury found BabyBus' JoJo virtually identical to Moonbug's JJ. JoJo is in all of BabyBus' accused Super JoJo videos.  (*See* 9-SER-1888.)  Thus, the jury's verdict would not have changed based on any of the errors alleged by BabyBus.

As *Harper House* explained, even a compilation of uncopyrightable utilitarian forms is still entitled to some copyright protection and can be infringed if there is "bodily appropriation of expression."  889 F.2d at 205.  Here, the jury found JJ and JoJo "virtually identical," meaning that whatever copyrightable combination of expression the jury found, JoJo misappropriated it.

### III.    The District Court Did Not Abuse Its Discretion in Its Verdict Form

The verdict form asked the jury to give a general verdict by determining the ultimate legal questions at issue—whether Moonbug's copyrights were infringed and, if so, whether that infringement was willful.  (*See* 2-ER-145–49.)  The rules allow a general verdict like the one in this case.  *See* Fed. R. Civ. P. 49(b); *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003) ("[T]he key is not the number of questions on the verdict form, but whether the jury announces the ultimate legal result of each claim.").

The verdict form did not "invert the burden of proof," as BabyBus argues.  (AOB 58.)  The jury was properly instructed on the burden of proof.  (*See* 1-ER-71; 15-SER-3071.)

BabyBus' argument that the verdict form should have contained over 300 questions to make it easier to review the sufficiency of the evidence or the appropriateness of injunctive relief is also wrong.  (*See* AOB 58.)  BabyBus' preferred approach is impractical and unnecessary.  The jury found that BabyBus' JoJo character was virtually identical to JJ and that BabyBus willfully infringed Moonbug's copyright in the 2D artwork for JJ.  (2-ER-145–50.)  All of BabyBus' Super JoJo videos focus on JoJo as the main character.  (9-SER-1888.)  The verdict makes apparent that the jury found facts establishing all of Super JoJo infringed on at least one of Moonbug's copyrights.  *See Westinghouse Elec. Corp.*, 106 F.3d at

64

901 (holding the district court may draw "inferences from the verdicts to determine the issues that the presumptively rational jurors must have determined, and then use[] those implicit findings of fact as the basis for judgment as to certain issues.").

Nor does the verdict form make the damages "speculative and unsupported," as BabyBus argues.  (AOB 58–59.)  The only authority BabyBus provides—*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996)—*upheld* a verdict because the litigants failed to meet the high burden to justify a new trial on damages.  BabyBus provides no authority that damages between the values argued by the parties are necessarily speculative or unsupported.  To the contrary, "the jury may make a just and reasonable estimate of the damage based on relevant data" and it is "allowed to act on probable and inferential as well as (upon) direct and positive proof."  *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

## CONCLUSION

For the reasons stated, this Court should affirm the judgment.


Date: April 10, 2025                    TYZ LAW GROUP PC

                                        */s/ Sean Apple*                    
                                        Sean Apple

                                        *Attorneys for Plaintiffs-Appellees*
                                        Moonbug Entertainment Limited and
                                        Treasure Studio, Inc.

66

### STATEMENT OF RELATED CASES

Appellee is not aware of any related case pending in this Court.

Date: April 10, 2025

TYZ LAW GROUP PC

*/s/ Sean Apple*
Sean Apple

*Attorneys for Plaintiffs-Appellees*
Moonbug Entertainment Limited and
Treasure Studio, Inc.

**CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32-1 because this brief contains 13,214 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of rule 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Date: April 10, 2025                         TYZ LAW GROUP PC

                                             */s/ Sean Apple*
                                             Sean Apple

                                             *Attorneys for Plaintiffs-Appellees*
                                             Moonbug Entertainment Limited and
                                             Treasure Studio, Inc.

68